IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| SE PROPERTY HOLDINGS, LLC, | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION 11-0629-WS-B |
| | ) | |
| THE ROOKERY III, A CONDOMINIUM, | ) | |
| OWNERS' ASSOCIATION, INC., *et al.*, | ) | |
|     Defendants. | ) | |
| ———————————————— | ) | |
| | ) | |
| THE ROOKERY III, A CONDOMINIUM, | ) | |
| OWNERS' ASSOCIATION, INC., *et al.,* | ) | |
|     Counterclaim/Third-Party Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SE PROPERTY HOLDINGS, LLC and | ) | |
| VISION BANK, | ) | |
|     Counterclaim/Third-Party Defendants. | ) | |

## ORDER

This matter comes before the Court on a quartet of overlapping summary judgment motions, to-wit:  SE Property Holdings, LLC's Motion for Summary Judgment (doc. 26); Motion for Summary Judgment by Marion Cooper (doc. 29); Motion for Summary Judgment by the Rookery III, A Condominium, Owners' Association on the Complaint (doc. 32); and the Association's Motion for Summary Judgment on its Counterclaim/Third-Party Complaint (doc. 35).  The Motions have been briefed and are ripe for disposition.[1]

---

[1]     Two points bear noting from the outset.  First, both the Association and Cooper have requested oral argument on their Rule 56 Motions.  The Local Rules allow for oral argument; however, they also state that "the court may in its discretion rule on any motion without oral argument."  LR 7.3.  After careful review of the parties' lengthy written submissions, the undersigned finds that oral argument would be neither necessary nor helpful in resolving the issues presented; therefore, the request for oral argument is **denied**.  Second, both the Scheduling Order (doc. 16, ¶ 13(c)) and a separate Order (doc. 40) entered on August 21, 2012 instructed the parties to submit to chambers courtesy hard copies of their summary
(Continued)

## I.      Nature of the Action.

Although this lawsuit has a plethora of moving parts, the parties' dispute at its core is quite simple.  A lender, Vision Bank ("Vision"), foreclosed on a condominium developer's mortgage and acquired certain property from a condominium development called "The Rookery III."  Vision promptly conveyed that property to an affiliated entity, SE Property Holdings, LLC ("SPH").  Subsequently, a dispute emerged between SPH and the condominium owners' association, called The Rookery III, a Condominium Owners' Association, Inc. (the "Association").  Flashpoints of disagreement included SPH's liability (if any) for monthly condo assessment fees and SPH's rights (if any) to access the Association's books and records, to call for Association meetings, and so on.  The dispute escalated when the Association's agent, Marion Cooper ("Cooper," not to be confused with nonparty Joe Cooper, who was the Association's corporate representative in this litigation), signed liens that were filed in probate court against SPH's property for the unpaid assessments.

The ultimate, unfortunate result of these circumstances (and the parties' inability or unwillingness to forge a reasonable compromise) was that everybody sued everybody else in federal court.[2]  In particular, SPH filed suit against the Association and Cooper seeking (in Count One) declaratory and injunctive relief on a host of subjects, including the units on which the Association can assess common expenses, SPH's rights to select the Association's directors and to access its books and records, the validity of the Association's assessments and liens against SPH's property, and the Association's obligation to render an accounting of its finances.  In Count Two, SPH sued Cooper directly for damages under Alabama Code § 10A-1-3.32, for denying SPH access to the Association's books and records.  And in Count Three, SPH brought a

---

judgment filings.  All parties except for SPH complied with this requirement.  In lieu of issuing a third order directing SPH to provide such courtesy copies and/or to show cause for its failure to adhere to the aforementioned directives, the Court in its discretion will consider those materials as submitted.

[2]      No federal claims are asserted.  Nonetheless, SPH properly invoked federal subject-matter jurisdiction under 28 U.S.C. § 1332, as the well-pleaded allegations of the Complaint establish complete diversity of citizenship between SPH (on the one hand) and the Association and Cooper (on the other), with the amount in controversy substantially exceeding the jurisdictional minimum of $75,000, exclusive of interest and costs.

slander of title claim against the Association and Cooper under Alabama law, alleging that the defendants had refused or failed to release or cancel the liens on SPH's property, all to SPH's detriment.  (*See* doc. 1.)

The Association and Cooper responded in kind, unleashing a volley of counterclaims against SPH and third-party claims against Vision.  (*See* doc. 5.)  In particular, the Association brought a claim for open account, alleging that Vision owed it $226,800 in unpaid monthly assessments for the development's units (Count One); another claim for open account, alleging that SPH owed it $162,000 in unpaid monthly assessments for those same units (Count Two); a claim against Vision and SPH for open account, claiming that Vision's or SPH's "agent or employee turned on the water at the Project without authority" and that they are therefore "indebted to the Association for the unpaid water bill" (doc. 5, at 17) (Count Three); and a statutory claim against Vision and SPH for enforcement of liens pursuant to Alabama Code § 35-8A-316 (Count Four).  Also, Cooper sued SPH under the "Alabama Litigation Accountability Act and Rule 11," insisting that SPH's claims against her were brought in bad faith and without substantial justification, entitling her to recover monetary sanctions, attorney's fees, and expenses (Count Five).

True to form, everybody has now moved for summary judgment against everybody else via overlapping and often redundant Rule 56 filings, placing the merits of this action before the undersigned for review and (to the extent appropriate) resolution under Rule 56 of the Federal Rules of Civil Procedure.

## II.   Factual Background.

The parties' summary judgment filings are noteworthy for the dearth of factual disputes identified as to material matters.  With few (if any) exceptions, the material facts are uncontested and undisputed, to the point where it is fair to question why the parties did not streamline matters by submitting their legal arguments on stipulated facts.[3]

---

[3]     As SPH correctly observes in one of its briefs, "The parties agree on the vast majority of facts that are relevant to this dispute and material to the claims, counterclaims and third-party claims."  (Doc. 42, at 2.)  Nonetheless, to the extent that there are disputed facts, the Court construes the record, including all evidence and factual inferences, in the light most favorable to the non-movant.  *See Skop v. City of Atlanta, GA*, 485 F.3d 1130, 1136 (11th Cir. 2007).  As to each of the cross-motions for summary judgment, then, the record will be viewed in the light most favorable to the non-movant.

A.      *The Vision Loans, the Project, and Various Unit Purchases / Foreclosure.*

The summary judgment record reveals the following:  Back in 2007, Vision lent money to a developer to build a condominium project known as The Rookery III (the "Project") in Gulf Shores, Alabama.  To secure the loans, the developer provided two mortgages to Vision covering the property where the Project was to be built.  On December 31, 2007, the developer filed in Baldwin County Probate Court certain governing documents for the Project, including Articles of Incorporation for the Association, a Declaration of Condominium, Association Bylaws, and a proposed Site Plan.  (Doc. 27, Exhs. A-D.)  The Site Plan depicts 88 planned units in buildings of either duplex or single-family residence construction, all with the prominent legend "Need Not be Built."  (Doc. 27, Exh. D.)  And the Declaration specifies that "[t]he maximum number of condominium units which shall comprise The Rookery III, a Condominium, is eighty eight," to be built in phases of 10 units each, subject to a prominent disclaimer that each phase "NEED NOT BE BUILT."  (Doc. 27, Exh. C, Art. 4.)

As of June 9, 2008, the developer filed an Updated Site Plan reflecting that some 23 units had been constructed, including the units numbered 4001, 4002, 4008, 4009, 4010, 4013, 4014, 4015, 5006, 6002, 6004, 6005, 6006, 6008, 6012, 6017, 6019, 6022, 6023, 6025, 6032, 6035, and 7002.  (Doc. 27, Exh. E.)  Two additional units (numbered 7014 and 7024) were partially built, but not completed.  In the summer of 2008, the developer successfully sold seven completed units, including those numbered 4001, 4008, 5006, 6002, 6005, 6017, and 7002 (collectively, "the 7 Sold Units").  Vision released the 7 Sold Units from its mortgages; however, it retained mortgages on the remainder of the Project, including the other 16 units that had been built but not sold (collectively, "the 16 Other Units"), two partially completed units (the "2 Incomplete Units") and what would have been the remaining 63 units (collectively, "the 63 Unbuilt Units") had the full 88-unit Project been constructed as planned.  As their moniker implies, the 63 Unbuilt Units were <u>never</u> constructed, by the developer or anyone else.  Even today, the 63 Unbuilt Units consist of nothing more than unimproved, bare land.[4]

---

[4]      In framing the facts this way, the Court notes that the parties' briefs and exhibits include inconsistencies concerning the number of unbuilt units.  For example, sometimes parties and witnesses refer to 65 unbuilt units, yet other times those same parties and witnesses write in terms of 63 (or even 66) unbuilt units.  This discrepancy echoes through the parties' filings, including their calculations of unpaid assessments, their assertions of what assessments and have (Continued)

Unfortunately for all concerned, the developer defaulted on its loan obligations, prompting Vision to initiate legal proceedings in state court in August 2009 in an effort to recover the unpaid loan balances. (Burnett Aff. (doc. 38, Exh. 2), ¶ 7.) By mid-2010, the developer notified owners of units that it was abandoning the Project altogether because of financial difficulties. (J. Cooper Aff. (doc. 38, Exh. 3), ¶ 6.) Some time later, Vision initiated foreclosure proceedings, and conducted a foreclosure sale on the Project on June 30, 2011. (Harmon Decl. (doc. 27, Exh. F), ¶ 2.)[5] At that sale, Vision bought the entire property of the Project, save for the 7 Sold Units (as to which it had previously released its mortgage), for the sum of $1.391 million. (*Id.* & Exh. 1.) Thus, as of July 1, 2011, the Project's owners consisted of the purchasers of the 7 Sold Units (who owned their individual units) and Vision (which owned everything else, including the 16 Other Units, the 2 Incomplete Units and the 63 Unbuilt Units). Vision held this property for just a few days, before conveying it to SPH via Quitclaim Deed for slightly over $1.3 million on July 12, 2011. (Harmon Decl., ¶ 3 & Exh. 2.)[6]

---

not been paid and for which units, and so on. While these discrepancies may be distracting, they are not material to the issues presented on summary judgment. The tripartite categorization of the units that SPH came to own in July 2011 (consisting of the 16 Other Units, the 2 Incomplete Units, and the 63 Unbuilt Units) appears to be the most accurate rendering of facts in the record. The Court therefore adopts that formulation, and will not squander resources revisiting whether, for example, there are 63 or 65 or 66 unbuilt units, each time the parties' briefs or witness statements waver on the point.

[5]     The Harmon Declaration reflects that the foreclosure sale took place on January 30, 2011; however, this appears to be a typographical error, given that the Foreclosure Deed appended to this Declaration repeatedly dates the foreclosure sale as having occurred on June 30, 2011. (Harmon Decl., at Exh. 1.) The parties' briefs also fix June 30, 2011 as the date of sale. (*See* doc. 27, at 3; doc. 33, at 6.)

[6]     Vision merged with SPH on February 16, 2012. (Harmon Decl., ¶ 1.) The Certificate of Merger and Transfer memorializing that transaction confirms that as of that date, "Vision Bank no longer exists as a separate entity" and SPH "is the successor to Vision Bank, and may undertake any and all actions to which Vision Bank was entitled, and is subject to all rights and liabilities to which Vision Bank was subject." (Doc. 27, Exh. I, ¶¶ 1, 7.) In light of these developments, the Association's and Cooper's insistence on continuing to press third-party claims against Vision (rather than simply folding those claims into their existing counterclaims against SPH, which by all accounts is legally responsible for any liabilities and obligations of the now-nonexistent Vision) serves only to inject unnecessary, confusing layers of parties and claims into these proceedings. This is particularly true, given the Association's admissions during (Continued)

SPH undertook efforts to sell the property, and successfully sold each of the 16 Other Units, plus the 2 Incomplete Units, in the time period of February – June 2012, while this litigation was ongoing.  (Harmon Decl., ¶ 5; doc. 38, Exh. 6.)  Because SPH and the Association continue to quarrel over unpaid assessments (as discussed in detail *infra*), SPH reduced the amount each buyer of the 16 Other Units paid at closing by the amount the Association claimed was owed in back assessments for that unit.  (Harmon Decl., ¶ 5 & Exh. 5.)  Also, at each of those closings, SPH obtained from the purchaser an "Irrevocable Proxy."  (Harmon Decl., ¶ 6.)  Each proxy states that the purchaser is granting SPH "an irrevocable proxy and right to vote … as a member of the [Association] and as the owner of the Unit … for a period of one (1) year commencing on the date hereof."  (*Id.* at Exh. 6.)

In addition to selling the 16 Other Units and the 2 Incomplete Units, SPH has attempted to sell all of its remaining property at the Project, including specifically the 63 Unbuilt Units (which, again, consist of nothing but bare land).  (*Id.*, ¶ 7.)  For reasons not disclosed in the record, SPH has not yet sold the land.  (*Id.*)

### B.    The Association and the Monthly Assessments.

In February 2007, the Association's Board of Directors prepared a "First Year's Projected Operating Budget," calling for monthly maintenance fees of $400 per unit.  (Burnett Aff., ¶¶ 2-3 & Exh. A.)  After the developer sold the 7 Sold Units in the summer of 2008, the Board reduced the monthly assessment to $375 per unit.  (*Id.*, ¶ 4.)[7]  As of the summer of 2010, however, the original Board abandoned the Project, leaving the owners of the 7 Sold Units to their own devices to convene a new Association Board of Directors, which they did.  (*Id.*, ¶ 6; J. Cooper Aff. (doc. 38, Exh. 3), ¶ 6.)

---

summary judgment briefing that "Vision Bank has merged with and into SPH so that SPH is the surviving corporation. … As a result, SPH is obligated and liable for all of Vision's obligations to the Association."  (Doc. 33, at 12.)

[7]    By all appearances, the original Projected Operating Budget was provided to the purchasers of the 7 Sold Units at the time of their respective closings.  (J. Cooper Aff. (doc. 38, Exh. 3), ¶ 4 & Exh. A.)  The owners of the 7 Sold Units dutifully paid $375 monthly assessments during the years of 2008 through 2010.  (*Id.*, ¶ 5.)

On July 31, 2010, the Association's new Board conducted a meeting to address financial, maintenance and other issues.  (J. Cooper Aff., ¶ 7.)  Owners of all 7 Sold Units were notified, invited to attend, and given a breakdown of the Association's expenses.  (*Id.*, ¶ 7 & Exhs. B & C.)  Vision was not, as it owned no units but was merely a mortgagee at that time.  The day after the meeting, the Association circulated an e-mail reflecting that dues were set at $400 per month and that the next meeting was set for October 9, 2010.  (*Id.*, ¶ 7 & Exh. D.)  The Association did not transmit this memorandum to (or share the information contained therein with) Vision.

On October 4, 2010, the owners of the 7 Sold Units (calling themselves "The 7 Owners of Units in Rookery III," rather than the Association) wrote a letter to Vision describing their financial difficulties following the developer's abandonment of the Project.  (J. Cooper Aff., ¶ 9 & Exh. E.)  Citing no legal or contractual authority, the letter set forth the position of "The 7 Owners" as follows:  "We feel it is time for the Bank to pay monthly association dues … for the units that have been completed."  (*Id.*, Exh. E.)  The October 4 letter did not purport to ask Vision to pay dues for the 63 Unbuilt Units.  Moreover, the October 4 letter did not identify what the monthly assessment figure was, or how much "The 7 Owners" wanted Vision to pay. Certainly, nothing in the October 4 letter stated or implied that "The 7 Owners" believed that delinquent assessment charges were due and owing by Vision at that time; rather, the tone of the letter is reasonably clear that "The 7 Owners" were requesting only that bank contribute prospective assessments for the 16 Other Units.  On October 13, 2010, Vision responded with a letter of its own, notifying the owners that "[w]e have referred this matter to our legal council [*sic*] for review" and that counsel may or may not choose to respond to the request that Vision pay monthly assessments.  (*Id.*, Exh. F.)  Vision sent no other response to the October 4 letter. More importantly, Vision did not accede to the request or begin paying assessments on the 16 Other Units or anything else.  (J. Cooper Aff., ¶¶ 9-10.)

The Association did not follow up on its October 4, 2010 request for an entire year.  The record reveals a dearth of activity as to Association matters during that time.  There is no evidence, for example, that the Association conducted regular meetings during the October 2010 – October 2011 time frame.  There is no evidence that the Association invited Vision (or SPH) to attend meetings or even notified them when such meetings were scheduled (if indeed such meetings ever took place).

### C.    The Liens, Information Requests, and Ensuing Lawsuit.

This period of relative tranquility was shattered in October 2011, as both sides retained counsel and engaged in a rapidly escalating exchange of correspondence that fanned faint embers of discontent into a blazing conflagration in a matter of days.  On October 4, 2011, the Association's counsel sent a letter to Vision, stating that "the Association hereby makes demand on Vision Bank to remit the sum of $328,000 for unpaid monthly fees and/or assessments related to the condo units set forth on Exhibit A."  (J. Cooper Aff., ¶ 11 & Exh. G.)  The referenced Exhibit A detailed the Association's calculations as follows:  For each of approximately 82 units (including the 16 Other Units, the 2 Incomplete Units and the 63 Unbuilt Units), the Association claimed that Vision owed $400 monthly assessments for a 10-month period from January through October 2011.[8]  The October 2011 letter threatened that unless Vision paid the full amount with six days, "the Association will be filing liens against each unit" for the alleged unpaid assessments.  (*Id.*)  Vision did not pay.

On October 21, 2011, the Association followed up with another letter to Vision (as well as to SPH and Vision's parent company) reiterating the demand for payment, accusing Vision of "again hiding its head in the sand regarding its obligations," and confirming that the Association had "filed liens against each of the lots owned by Vision in The Rookery III."  (J. Cooper Aff., ¶ 12 & Exh. I.)  It was true.  On October 14, 2011, Cooper (owner of one of the 7 Sold Units) signed liens as "agent" of the Association, which liens were filed in Baldwin County Probate Court later that day.  (M. Cooper Aff. (doc. 38, Exh. 4), ¶ 7.)  The liens consisted of 81 substantively identical "Verified Statements of Lien," each specifying that the Association was claiming a lien on a particular unit "to secure an indebtedness of $4,000 with interest and reasonable attorney's fees" for "delinquent assessments."  (Harmon Aff., ¶ 4 & Exh. 3; M. Cooper Aff., ¶ 7.)  Cooper was chosen to sign the liens on the Association's behalf "primarily for logistical reasons, because [she] happened to be in Gulf Shores at that time."  (M. Cooper Aff., ¶ 7.)  The liens covered each of the 16 Other Units, the 2 Incomplete Units, and the 63 Unbuilt Units.

---

[8]    That Exhibit A lists "Pre-foreclosure Assessments" for the period of "Jan – Jun 2010;" however, the 2010 reference appears to be erroneous given that foreclosure occurred on or about June 30, 2011, and not June 2010.

The October 21 letter triggered an immediate and aggressive response, in the form of a letter by Vision's counsel dated the same day.  (J. Cooper Aff., ¶ 13 & Exh. J.)  Vision's letter expressed the bank's position that neither the Association's counsel nor Cooper was authorized to act on behalf of the Association, given that Vision owned the majority of the units (and held the majority of votes to be cast at any Association meeting) at The Rookery III, and that the Association had failed to provide notice of any meeting to Vision, much less to conduct any valid meetings to elect a board of directors or authorize the actions of Cooper and the Association's counsel.  Vision's letter indicated that, because of these omissions, the liens signed by Cooper were "invalid, unlawful and constitute slander of Vision Bank's title to the property," and must be released immediately.  (*Id.*)  Vision further expressed its intent to call a special meeting of unit owners to elect a new board of directors for the Association, and called upon the Association's counsel to furnish a list of names and addresses of unit owners to facilitate proper notice of such meeting.  Finally, Vision demanded access to the Association's financial and other records, and requested notice of "reasonable times during the next two (2) business days during which a representative of Vision Bank may inspect and copy all such records."  (*Id.*)  Three days later, the same law firm sent a similar letter to the Association, this time on behalf of SPH, Vision, and their parent company, rather than just Vision.  (J. Cooper Aff., ¶ 14 & Exh. K.)[9]

The Association responded to both the October 21 and October 24 letters via correspondence of its own dated October 27, 2011.  (J. Cooper Aff., ¶ 15 & Exh. L.)  That letter accused Vision of "irresponsible lending practices," contended that Vision had delayed foreclosure on the Project for two years after the developer's default for the purpose of avoiding liability for assessments and "put[ting] the entire cost of this situation on the backs of the seven (7) owners," and ratcheted up the rhetoric by asserting that SPH was "play[ing] legal games regarding who has what rights under what agreements."  (*Id.*)  Not surprisingly, the October 27 letter was not well received by SPH.  On November 1, 2011, SPH's counsel sent another letter to the Association's counsel, reiterating the bank's legal position, demanding cancellation of the existing liens against SPH's property, calling for immediate access to the Association's books

---

[9]      The most noteworthy content modifications in the October 24 letter were that it apprised the Association that SPH had purchased all of The Rookery III property previously owned by Vision as of July 2011; and that SPH was requesting that the Association deliver the roster of unit owners and make available its financial and other records within the next five days.

and records, and so on.  (J. Cooper Aff., ¶ 16 & Exh. M.)  Ominously, the November 1 letter included a statement that SPH intended to sue Cooper personally as an "agent" or "governing person" of the Association if she did not "provide SPH with immediate access to the books and records."  (*Id.*)  The November 1 letter demanded that the Association and Cooper provide written notice by the close of business on November 3 as to (i) whether the Association's books and records would be made available to SPH and, if so, when and where; and (ii) whether they would release the liens filed against SPH's property.

There was some follow-up email correspondence between counsel concerning the exchange of books and records.  (J. Cooper Aff., ¶ 17 & Exh. N.)  Unfortunately, it was much too little, much too late.  The Association allowed the November 3 deadline to expire without any serious effort at compliance with SPH's demands.[10]  Cooler heads did not prevail, and SPH filed suit on November 4, 2011 against the Association and Cooper.

Interestingly, on November 23, 2011, some 19 days after suit was filed, the Association's attorney executed a "Release of Recorded Lien" as to all 81 parcels at The Rookery III owned by SPH.  The Baldwin County Probate Court recorded that release effective December 10, 2011.  (M. Cooper Aff., ¶ 10 & Exh. A.)[11]  This apparent olive branch did not result in the modification, redaction or dismissal of any of SPH's claims against the Association or Cooper.  Moreover, post-filing demands by Cooper's counsel that SPH withdraw its claims against her (M. Cooper Aff., ¶ 12 & Exh. B) fell on deaf ears, resulting in the proliferation (rather than the narrowing) of litigation as Cooper lodged counterclaims of her own against SPH.

---

[10]     On this record, Marion Cooper's protestations that she "did not refuse SPH's demand" for access to books/records or release of the liens because she "understood that the parties' attorneys were working things out" was simply inaccurate.  (M. Cooper Aff., ¶ 11.)  Frankly, the record indicates that neither side made a *bona fide* effort to "work things out" amicably, but instead layered one sharp-tongued, ante-upping demand atop another until litigation became inevitable.

[11]     In that Release, however, the Association hastened to add the following caveat:  "[T]he release of the above liens does not constitute and shall not be construed as evidenced [*sic*] that the indebtedness relating to such liens has been satisfied.  Such indebtedness remains unpaid and due and owing to the Association."  (*Id.*)  So in releasing the liens, the Association did not back off or withdraw its prior public statements that SPH owed thousands of dollars in delinquent assessments on each unit, including the dozens of units that had never been built.

III.    **Summary Judgment Standard.**

        Summary judgment should be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56(a), Fed.R.Civ.P.  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."  *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991).  Once the moving party has satisfied its responsibility, the burden shifts to the non-movant to show the existence of a genuine issue of material fact.  *Id.*  "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment."  *Id.*  (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted).  "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter.  Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted).  "Summary judgment is justified only for those cases devoid of any need for factual determinations."  *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).

        Both sides have moved for summary judgment on all or substantially all of the claims, counterclaims and third-party claims interposed herein.  The law is clear that "[t]he applicable Rule 56 standard is not affected by the filing of cross-motions for summary judgment."  *Page v. Winn-Dixie Montgomery, Inc.*, 702 F. Supp.2d 1334, 1345 (S.D. Ala. 2010) (citations omitted); *see also Murray v. Holiday Isle, LLC*, 620 F. Supp.2d 1302, 1307 (S.D. Ala. 2009) (same).  The Eleventh Circuit has explained that "[c]ross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed."  *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) (citation omitted); *see also Wermager v. Cormorant Tp. Bd.*, 716 F.2d 1211, 1214 (8th Cir. 1983) ("the filing of cross motions for summary judgment does not necessarily indicate that there is no dispute as to a material fact, or have the effect of submitting the cause to a plenary determination on the merits").  Nonetheless, "cross-motions may be probative of the absence of a factual dispute where they reflect general agreement by the

parties as to the dispositive legal theories and material facts." *Page*, 702 F. Supp.2d at 1345 (citations omitted); *see also Murray*, 620 F. Supp.2d at 1307. Such is the case here.

## IV.   Analysis.

Given the breadth and volume of the causes of action joined in this case, the Court will proceed on a claim-by-claim basis. The logical starting point is to address the parties' competing claims concerning unpaid monthly assessments, after which the Court will move on to examine the other facets of SPH's claims for declaratory and injunctive relief, the claims brought by and against Marion Cooper, SPH's claim for slander of title, and finally the Association's claims for an unpaid water bill and enforcement of liens.

### A.   The Dueling Claims Regarding Unpaid Assessments.

#### 1.   The Parties' Respective Positions Concerning Assessments.

Although this case embraces a variety of topics, the centerpiece of the parties' dispute is and has always been whether SPH must pay monthly assessments to the Association for any unit or portion of The Rookery III property. Nor is this a mere trifling disagreement. By the Association's reckoning, SPH is responsible for more than $500,000 in delinquent assessments spanning more than 80 units for a period including the first six months of 2011, as well as unpaid assessments for the 63 Unbuilt Units from July 2011 through the present.[12] By SPH's calculations, however, it is responsible for exactly $0 in assessments. That chasm is the animating force of this litigation, with the other ancillary issues amounting to little more than collateral skirmishes.

In Count One of the Complaint, SPH requests a declaration that the assessments imposed by the Association on SPH's property at The Rookery III are "invalid" and that SPH has no obligation to pay them. (Doc. 1, at 7.) In its slander of title claim (to be discussed separately *infra*), SPH also seeks to recover $58,800 in assessments paid to the Association at the closing of SPH's sales of the 16 Other Units. (Doc. 27, at 14.) For its part, the Association seeks damages from Vision on an "open account" theory for the six months preceding foreclosure and for one

---

[12]      A witness for the Association computes the owed assessments as follows: (i) for the first half of 2011, 81 units x $400/month x 6 months = $194,400; (ii) from July 2011 through August 2012, 65 units x $400/month x 13 months = $338,000; and (iii) from August 2012 through the present, $26,000/month (or $104,000 through December 2012). (J. Cooper Aff., ¶¶ 18-19.) So the Association appears to be demanding unpaid assessments of roughly $636,400.

month following foreclosure for 81 units at $400 per unit per month (or $226,800), all pursuant to Alabama Code § 35-8A-316.  (Doc. 5, ¶ 18.)  The Association also seeks damages from SPH on an "open account" theory for unpaid assessments at the 63 Unbuilt Units from July 2011 through the present, or 63 units x $400/month x 17 months (or $428,400).  The critical components of the parties' dispute concerning assessments are (i) whether SPH owes anything at all for unpaid monthly fees; and (ii) if so, whether SPH's payment obligations extend to the 63 Unbuilt Units (*i.e.*, whether unit assessments are properly levied on unimproved land owned by SPH that was originally intended to constitute 63 additional units but was never developed).

Before tackling these questions, it is helpful to summarize the relevant record facts.  As of July 2010, the Association conducted a meeting and set monthly assessments at $400 per unit for owners of the 7 Sold Units.  In July 2011, following a Vision foreclosure sale and subsequent conveyance, SPH became the owner of all other property at The Rookery III, including the 16 Other Units, the 2 Incomplete Units, and the 63 Unbuilt Units.  Neither Vision nor SPH paid monthly assessments on any of these units in connection with the foreclosure sale or the subsequent conveyance to SPH, and SPH did not volunteer such assessments thereafter.  The Association does not appear to have held meetings in 2011 or to have provided notice to Vision or SPH of any such meetings; moreover, the Association does not appear to have taken any affirmative steps to review or fix monthly assessments during 2011 or to apprise unit owners (including Vision or SPH) of any such developments.  In the spring of 2012, SPH successfully sold 18 Units, consisting of the 16 Other Units and the 2 Incomplete Units.  In connection with these sales transactions, SPH reduced the purchase price at closing by a total of $58,800 for the 16 Other Units to account for the Association's demands for unpaid assessments.  (Harmon Decl., ¶ 5.)  Those withheld assessments were paid to the Association.  (No assessments were held back for the 2 Incomplete Units.)

> 2.     *Whether All Assessments Imposed by the Association are Invalid.*

As an initial proposition, SPH contends that, as a matter of law, it owes no monthly assessments to the Association for any of its property because the Association failed to comply with applicable requirements for "notice, meeting, voting, and record keeping," which it contends are necessary conditions precedent for the Association "to validly assess common expenses against any Units."  (Doc. 27, at 8.)  SPH argues that the Alabama Uniform Condominium Act, as well as The Rookery III's Declaration and Association Bylaws, impose

certain procedural requirements that the Association simply did not follow.  Indeed, the Association's Bylaws require annual meetings, annual elections of Directors, notice of meetings, a formal budget process, and so on.  (Doc. 27, Exh. C.)  The Association admits that it failed to observe certain of these formalities.  For example, the Association never conducted an annual meeting as required by its Bylaws.  (J. Cooper Dep., at 74.)  The Association never gave notice to SPH or Vision of any meetings.  (*Id.*)

The Association counters that these shortcomings do not invalidate the $400 monthly assessments, based on Paragraph 46 of the Bylaws.  That paragraph provides, in relevant part, as follows:

> "Annual assessments against the condominium unit owners for their respective shares of the items of the budget shall be made for the calendar year annually in advance at the annual meeting to be held on the second Saturday in December of the year preceding the year for which the assessments are made.  Such assessments shall be payable in equal installments, commencing on the first day of each month of the year for which the assessments are made.  ***If an annual assessment is not made as required, an assessment shall be presumed to have been made in the amount of the last prior assessment.***"

(Doc. 27, Exh. C, ¶ 46 (emphasis added).  The Association's point is that the Association's acting Board of Directors (*i.e.*, the owners of the 7 Sold Units) unanimously agreed in July 2010 to fix assessments at $400 per month, just as had been done by the original Board of Directors back in 2007.[13]  That monthly assessment being properly in place, the Association reasons, it remained applicable in 2011 and 2012 despite the Association's failure to conduct an annual meeting, approve a budget, and the like during those years.

In response, SPH balks that the Association did not comply strictly with the Bylaws as to the July 2010 meeting because the notice was not in the correct form, the timing of the notice was inadequate, there was no detailed budget for the following year, and the Board did not provide notice 14 days in advance that ratification of a budget was to be considered at that

---

[13]    At the July 2010 meeting (at which all of the 7 Sold Unit's owners were present), the Association examined outstanding bills and recurring expenses, considered future insurance costs, and "tried to figure how much it would be and how much we needed to pay, each owner, and that's how we did the budget."  (J. Cooper Dep., at 30.)  The Association "went back over … all of the bills that had to be paid every month and we figured out how much that would total and we tried to come up with a figure that would be our monthly budget. … But we figured we had to pay $400 a month, each person, in order to pay our bills."  (*Id.* at 31.)

meeting.  (Doc. 42, at 3-4.)  SPH is correct that there were procedural irregularities as to the July 2010 meeting; however, such irregularities neither invalidate the Association's actions nor mandate a conclusion that that no assessments have ever been owed by any owner of any unit of The Rookery III at any time.  To accept SPH's formalistic argument would be to ignore the reality and context of what happened in July 2010.  The developer had abruptly abandoned The Rookery III, leaving the seven unit owners twisting in the wind.  In an effort to pick up the pieces and take financial responsibility for the condominium complex, all seven unit owners attended a meeting at a mutually agreeable time and place.  They reviewed The Rookery III's recurring expenses and fixed a monthly assessment figure ($400) that they believed would be adequate to cover those expenses.  Perhaps they did not observe all corporate niceties, but the facts remain that every single unit owner at that time was on board with and agreeable to the $400/month assessment plan, and that those existing unit owners have faithfully paid that fee to the Association ever since.[14]

SPH identifies no aspect of the Alabama Uniform Condominium Act, the Bylaws or Declaration, or Alabama case law that demands strict compliance with all notice and budgeting procedures, and invalidates assessments imposed by the Association in the absence of same (even if all unit owners contemporaneously voted on and agreed with that assessment plan).[15]

---

[14]     For its part, SPH has made no argument or showing that it (or Vision) was entitled to be heard about the Association's budget or assessment calculations as of July 2010.  Recall that SPH/Vision was simply a mortgagee at that time, and did not own a single unit at The Rookery III.  To be sure, SPH/Vision could have foreclosed on those mortgages earlier; however, it chose not to do so, and must bear the consequences of that election.  Under the circumstances, SPH/Vision identifies no authority and advances no argument that would have entitled it to be heard or to object in July 2010 to the method and manner of fixing monthly assessments for The Rookery III.  Every unit owner at that time acquiesced to the process and the result without objection.  Surely, this constitutes substantial compliance with the Bylaws under any reasonable interpretation.

[15]     The hypertechnical, form-over-substance nature of SPH's argument is laid bare by its admission that the selected monthly assessment figure approved by all unit owners in July 2010 was in fact reasonable.  *See* doc. 42, at 7 ("The seven unit owners have, by paying between a $375 to $400 per month assessment, met the common element expense obligations of the project as built.").  So SPH has no quarrel with the amount of the assessment imposed in July 2010.  Likewise, it appears to have no quarrel with the lack of notice to SPH/Vision of the July 2010 meeting, given its status as a mortgagee (not an owner) at that time.

Courts in other jurisdictions have refused in analogous circumstances to require mechanistic compliance with notice requirements in the absence of prejudice. *See generally Restatement (Second), Judgments*, § 3, comment b ("The modern approach to notice-giving attaches primary importance to actual notice and treats technical compliance with notice procedures as a secondary consideration. … To invalidate the notice simply because it is irregular is to protect no worthwhile interest of the party who has raised the objection. He has had his due."); *Twenty-Four Merrill Street Condominium Ass'n, Inc. v. Murray*, 902 A.2d 24 , 29 (Conn. App. 2006) (applying comment b to condominium bylaw notice requirements); Gary A. Poliakoff, 1 *Law of Condominium Operations* § 5:8 ("In reviewing whether bylaws support the imposition of assessments, substantial compliance with substantive requirements of the bylaws may support imposition of an assessment, even if the association has made technical or ministerial errors in imposing such costs on unit owners.").

There is a more fundamental problem with SPH's argument. The logical consequence of SPH's position (*i.e.*, that all assessments imposed on unit owners at The Rookery III since 2007 are void) is that all unit owners would be entitled to return of their assessment payments because all assessments were invalid. The Association would have no means of paying its bills and presumably the entire enterprise would go up in smoke. A condominium association's bylaws are not a suicide pact,[16] and this Court declines to construe them as such, particularly given the stated Alabama legislative concern that "[t]he economic viability of condominium associations is a major concern of the drafters of the present act." Ala. Code § 35-8A-315 (Alabama Commentary, ¶ 1); *Restatement (Third), Property (Servitudes)* § 6.5 (comment (b)) ("The assessment power is critical to the financial viability of most common-interest communities."). This Court will not accede to SPH's request that the Bylaws be construed in a manner that unravels a financial arrangement to which all unit owners agreed in July 2010, to the prejudice of no one, simply because certain procedural requirements were not punctiliously observed, when

---

[16]     *See generally Barclay Square Condominium Owners' Ass'n v. Grenier*, 899 A.2d 991, 995 (N.H. 2006) ("We are also mindful that a condominium declaration should not be so narrowly construed so as to eviscerate the association's intended role as the governing body of the community. … The important role associations play in maintaining property values and providing municipal-like services justifies a broad view of the powers delegated to them.") (citations and internal marks omitted).

the effect of adopting SPH's stance would be to assure the economic destruction of the Association.

Based on the foregoing, the undersigned concludes that the $400 monthly assessment to which all unit owners agreed as of July 2010 was in fact a proper, valid assessment under applicable law and condominium documents.  That being the case, the Association's failure to make annual assessments after that date in accordance with the Bylaws is not fatal, but is instead saved by Paragraph 46's express allowance that "[i]f an annual assessment is not made as required, an assessment shall be presumed to have been made in the amount of the last prior assessment."  (Doc. 27, Exh. C, ¶ 46.)  Thus, there is a presumed valid $400/month assessment for each unit at The Rookery III, and the SPH's contention that no valid assessments exist must fail.[17]

> ### 3.   Whether Assessments Concerning the 63 Unbuilt Units are Invalid.

The determination that the $400 monthly assessments are generally valid still leaves the question of defining the portions of The Rookery III on which assessments are properly charged.  The parties' disagreement on this point is sharp.  For its part, the Association insists that SPH must pay assessments for the 63 Unbuilt Units for the entire time period at issue; meanwhile, SPH is adamant that no such assessments are due because those "units" do not exist and consist of nothing but vacant land.

The starting point of the analysis is the Alabama Uniform Condominium Act, which draws no distinction between built and unbuilt units.  As a general matter, the Act dictates that "all common expenses must be assessed against all the units."  Ala. Code § 35-8A-315(b).  And a "unit" is defined as "[a] physical portion of the condominium designated for separate ownership or occupancy."  Ala. Code § 35-8A-103(27).  The accompanying commentary explains that a unit "describes a tangible, physical part of the project."  *Id.* (Commissioners' Commentary, ¶ 16.)  Nothing in the text of the Act would exempt unbuilt units from the

---

[17]   This finding is dispositive of SPH's contention that it is entitled to recover damages for assessments collected by the Association out of sale proceeds at the closings of the 16 Other Units.  The monthly assessments on those completed units were in fact proper, and the Association was entitled to those funds.

definition of a "unit" on which assessments may validly be imposed.[18]  The Act makes clear, however, that where unit boundaries are fixed "by the declaration," such boundaries trump the statutory parameters.  Ala. Code § 35-8A-202(1); *see also* § 35-8A-103 (Commissioners' Commentary, § 1) (explaining that the Act "permits the defined terms used in the Act to be defined differently in the declaration and bylaws").[19]  Thus, if the Declaration of Condominium for The Rookery III limits "units" to completed physical buildings, then that definition governs.

The Declaration defines "unit" as "[a] physical portion of the condominium designated for separate ownership or occupancy, the boundaries of which are described herein."  (Doc. 27, Exh. B, at Art. 1, ¶ 2(w).)  With respect to boundaries, the Declaration explains that "[t]he boundaries of each unit are hereby designated as the innermost plane of the interior finished surfaces of the unit's walls, floors and ceilings."  (Doc. 27, Exh. B, at Art. 5, ¶ 6.)  SPH persuasively argues that, as to the 63 Unbuilt Units, there are no "innermost planes of the interior finished surfaces of the unit's walls, floors and ceilings," because those units have never been

---

[18]     This uncontroversial proposition has been adopted by courts in a number of states in interpreting their jurisdiction's version of the Uniform Condominium Act.  *See, e.g., Tara Manatee, Inc. v. Fairway Gardens at Tara Condominium Ass'n, Inc.*, 870 So.2d 32, 35 (Fla.App. 2 Dist. 2003) (under Florida law, "all units, whether built or unbuilt, must share in assessments for common expenses of the condominium"); *Centennial Station Condominium Ass'n v. Schaefer Co. Builders, Inc.*, 800 A.2d 379 (Pa. Cmwlth. 2002) (reviewing and agreeing with authorities from other jurisdictions "that the Uniform Condominium Act does not distinguish between completed and uncompleted units in the context of levying assessments for maintenance, repair and administration of common elements," and affirming lower court ruling that owner "was responsible for payment of fees for units that were declared but non-existent"); *Pilgrim Place Condominium Ass'n v. KRE Properties, Inc.*, 666 A.2d 500, 502 (Me. 1995) ("No provision of the Act requires any distinction between built and unbuilt units in the assessment for common expenses. … The Act implicitly recognizes that the creation of units owned by the declarant and the concomitant obligation to pay assessments may occur prior to the actual construction of the physical units.").

[19]     Commentators have similarly observed that the text of the condominium documents, not the language of the statute, ordinarily controls the question of whether owners of unbuilt units must pay condominium assessments.  *See* 15B Am.Jur.2d Condominiums and Co-operative Apartments § 33 ("Whether an unbuilt unit in a condominium is subject to the general assessment for common expenses depends generally on the particular declaration controlling the condominium."); 31 C.J.S. Estates § 268 ("While under some condominium documents the owner of undeveloped interests in a condominium project is not subject to assessments, under other condominium documents and statutory provisions the owner of unconstructed units may be assessed for common expenses.") (footnotes omitted).

built and consist of nothing more than bare land.  Logically, then, if a unit is defined by the Declaration as having boundaries consisting of "innermost planes of the interior finished surfaces," then an unbuilt unit cannot be a "unit" at all for purposes of the Declaration because the planes and surfaces that define the unit's physical parameters do not exist.  Furthermore, the Declaration describes the appearance of units as follows: "Each unit contains three bedrooms (one of which may be a den or study), two baths, washer and dryer closet, a kitchen-dining room – living room area, and screened porch."  (Doc. 27, Exh. B, at Art. 5, ¶ 5.)  The 63 Unbuilt Units contain no bedrooms, no baths, no closets, no kitchens, no dining rooms, no living rooms and no porches.  They are nothing more than vacant land.  As such, they are not within the scope of what is contemplated as a "unit" in the plain language of the Declaration.[20]

Moreover, there is persuasive support in the case law for SPH's interpretation of the Declaration as overriding the statute's failure to exclude unbuilt units from the definition of "units."  *See Aluminum Industries Corp. v. Camelot Trails Condominium Corp.*, 535 N.W.2d 74, 79-80 (Wis. App. 1995) (although statutory definition of "unit" encompasses property on which there is no constructed unit, declarations established that "units" are distinct from the land itself

---

[20]    Other provisions of the Declaration bolster and corroborate this determination. For example, the Declaration specifies that "[t]he eighty eight units which will comprise The Rookery III … will be/are contained in a number of buildings that will be/are of either duplex construction or single family residence construction."  (Doc. 27, Exh. B, at Art. 5, ¶ 1.)  The 63 Unbuilt Units are not contained in buildings of either duplex construction or single family residence construction, and there is no indication that they ever will be; to the contrary, the Declaration states in the clearest of terms that each phase of units "NEED NOT BE BUILT." (*Id.* at Art. 4, ¶ 1.)  If "units" are or will be contained in duplex or single-family buildings, then the 63 Unbuilt Units cannot be "units" within the contemplation of the Declaration.  Similarly, the Declaration describes various clusters of units as "more or less identical single family residence buildings" and other units as being "housed in a duplex residential building."  (*Id.* at Art. 4, ¶ 4.)  Again, the 63 Unbuilt Units are not single-family residence buildings, nor are they housed in duplex residential buildings; rather, they are simply plots of land.  Furthermore, the Declaration provides that "[t]he units … shall be restricted to residential use, only."  (*Id.* at Art. 12, ¶ 1.)  The 63 Unbuilt Units are incapable of residential use because they are merely unimproved land.  The Declaration indicates that "[n]o unit may be occupied by a number of persons in excess of the number permitted by the applicable zoning ordinance."  (*Id.* at Art. 12, ¶ 2.)  Of course, the 63 Unbuilt Units cannot be occupied at all, because they do not exist.  All of these provisions, read together, unmistakably show that the Declaration contemplates units as residences that are or will be built, not plots of empty land that have never been and (by all appearances, given the developer's abandonment of the Project years ago) never will become actual condominium residences.

by, for example, referring to floor plans, layouts, number of rooms, dimensions, and providing that boundaries of each unit are the area enclosed by walls, floor, and roof); *Country Oaks Condominium Management Committee v. Jones*, 851 P.2d 640, 641-42 (Utah 1993) (declaration provisions taken as whole "indicate that a unit exists only when a structure provides an enclosed area for the exclusive use and possession of the owner," such as (i) provision describing units as areas to which an owner shall have "exclusive ownership and possession," whereas owners of unbuilt units would have no means to exercise such exclusive ownership or possession of undeveloped land, and (ii) provision describing unit as a space enclosed within interior surface of walls, floors and ceilings).  The same kind of searching analysis of the condominium documents employed in *Aluminum Industries* and *Country Oaks* yields a conclusion that the condo documents governing The Rookery III exclude the 63 Unbuilt Units from the scope of units on which assessments may be levied.[21]

In so concluding, the Court has carefully weighed the Association's counterarguments. For example, the Association relies on *Mountain View Condominiums Homeowners Ass'n Inc. v. Scott*, 883 P.2d 453 (Ariz.App. Div. 2 1994).  That case appears distinguishable insofar as (i) it was predicated on a particular feature of Arizona law that "condominium ownership consists of individual ownership of a horizontal layer of cubic content space" (which the Association does

---

[21]     This conclusion is reinforced by the Commissioners' Commentary to the Alabama Uniform Condominium Act, which explains that "[i]f a condominium were said to consist from the beginning of a certain number of units, even though some of those units had not yet been completed or even begun, serious problems would arise if the remaining units were never constructed ….. [V]otes in the unit owners' association could be assigned to units, and those votes could be cast, even though the units were never built.  The Act therefore requires that *significant construction take place before units are assigned* an interest in the common elements, a vote in the association, and *a share of the common expense liabilities*."  Ala. Code § 35-8A-201 (Commissioners' Commentary, ¶ 5 (emphasis added)).  Of course, the Commissioners' Commentary is not binding.  And the text of § 35-8A-201 does not explicitly say that significant construction must occur before a unit may be assigned a share of common expense liabilities.  But the Commissioners' Commentary provides helpful guidance into the proper interpretation of the Act, and addresses how the very problems confronted here (unbuilt units as to which there are serious questions concerning voting rights and assessment obligations) should be resolved.  By imputing a "significant construction" requirement before any unit at The Rookery III accrues voting rights and assessment obligations, the Court assures (as the Commissioners' Commentary did) that the litany of "serious problems" described in the commentary does not and cannot come to pass.

not argue has any analog in Alabama law); and (ii) the Arizona court reasoned that "defendants' ownership interests must necessarily include not only the benefits but also the obligations of the previous owner" (yet the Association here does not suggest that The Rookery III's developer (the previous owner) was under an obligation to pay monthly assessments, or for that matter that SPH has received any of the benefits that the developer enjoyed).  *Id.* at 456, 458.  Likewise, the Association has shown that the 63 Unbuilt Units were subject to *ad valorem* taxes imposed by the Baldwin County Revenue Commissioner.  (Doc. 38, Exh. 7.)  But the Association has not explained why a taxing authority's treatment of the unbuilt units (which simply reflects the reality that SPH owns certain real property in Baldwin County and therefore must pay property tax on it just as any other owner of real property in the county must do) somehow translates into "unit" status under the Alabama Uniform Condominium Act, the Declaration, or the Bylaws.[22] And the Association's selective parsing of bits of language in the Declaration that it contends evince an intent to treat unconstructed units as units for assessment purposes is unavailing, when taken in the context of the entire document.[23]

---

[22]     If anything, these tax records work against the Association.  Each unbuilt unit was assessed property taxes at an annual rate of roughly $100, while the finished units were taxed at an annual rate of $900 or more.  (Doc. 38, Exh. 7.)  The disparity reveals that even taxing authorities were well aware of the considerable differences in valuation and usage of unbuilt versus built units, yet the Association insists that all units must be treated the same for assessment purposes whether they had been constructed or not.

[23]     In this regard, the Association points to the portion of the Declaration which specifies that "[e]ach unit of The Rookery III, a Condominium, shall have a 1/88 interest in the common elements" (doc. 27, Exh. B, at Art. 11, ¶ 1).  The Association interprets this language as implying that there must be 88 units regardless of which are built and which are not; however, the Association ignores the very next paragraph, which clarifies that "[t]he formula used to allocate common elements interests is to divide the whole of the common elements by the number of units" (*id.* at Art. 11, ¶ 2).  With that clarification, the Declaration readily allows alteration of the fractional shares of unit holders in common elements should the number of units rise above or dip below 88, so the mere invocation of a 1/88 fraction does not evince an intention that there will be 88 units in The Rookery III at all times, nor does it create any dilemma or unallocated shares if the number of units is lower (because, for example, some units are not built).  Similarly, the Association's reliance on language concerning "[t]he eighty eight units that comprise or will comprise the condominium project" (*id.* at Art. 5, ¶ 5) is misplaced.  That phrasing actually undermines the Association's position.  If the Association were correct, then 88 units must comprise the condominium project at all times past, present and future because a unit is a unit even if it is not built.  Yet the Declaration specifically recognizes that 88 units do not (or may not) comprise the project today by saying only that they "comprise or will comprise" it. (Continued)

Two other points bear noting.  The Association's present position that the 63 Unbuilt Units constitute "units" for which assessments are due runs counter to its own actions in July 2010, when it calculated expenses and divided them among the seven unit owners to fix monthly assessments.  If the Association had believed that The Rookery III consisted of 88 units, then it would have divided those expenses by 88 (not by seven) to derive a monthly assessment figure.  So the Association is asking the Court to accept a reading of the Declaration that conflicts with the Association's own actions, without explaining the reversal in its position.

The second point is actually a corollary of the first.  If the Court were to adopt the Association's view that monthly assessments of $400 were due on all of the 63 Unbuilt Units at all times, the result would be a vast windfall to the Association, as collections would outstrip common expenses by an enormous margin.  From January to December 2011, the Association's total expenses were $31,960.96, and it collected dues of $33,345.00, resulting in net ordinary income of $1,384.04.  (J. Cooper Dep., at Exh. 8.)  The Association would have this Court order SPH to pay $400 per month per unit for each of the 63 Unbuilt Units, which would amount to a total sum of $302,400 for the year 2011 alone.  Such an assessment would be vastly disproportionate to the Association's common expenses; indeed, not a penny of those assessment funds would actually defray common expenses, which had already been paid in full from other assessments.  This levy would therefore be patently improper and impermissible under the Act and the Declaration.  *See* Ala. Code § 35-8A-315(b) (assessments consist of "common expenses" of the association); doc. 27, Exh. B, at Art. 21, ¶ 2 (assessments consist of "[a]ll common expenses").[24]  The Association has not explained (and presumably cannot explain) why imposing assessments on SPH of nearly tenfold the total common expenses would be proper, valid, reasonable, or in any way defensible under applicable law or The Rookery III's governing

---

That verbiage suggests that the Declaration intended for a unit to count as a unit only once it had been built; otherwise, there would have been no need to include "comprise or will comprise" language because the 88 units would always comprise the project.

[24]        *See also Restatement (Third) Property (Servitudes)* § 6.5(2) ("Unless expressly authorized by the declaration, fees for services rendered, or for the use of common property, must be reasonably related to the costs of providing the service, or providing and maintaining the common property, or the value of the use or service.").

condominium documents.  What's more, if the 63 Unbuilt Units were indeed "units" on which assessments could be levied, this outcome would effectively open Pandora's box by raising a host of questions about how to correct the gross (and improper) disparity between actual assessments imposed and common expenses.[25]  The Court need not and will not attempt to answer those questions herein (none of which have been briefed by the parties in any event).  It suffices to recognize that, even if the Association's position that the 63 Unbuilt Units qualify as "units" for purposes of assessments were valid, the relief sought by the Association (to the tune of hundreds of thousands of dollars of assessment fees, over and above common expenses) would not be available or permissible, in any event.  Condo assessments are not a game of "Wheel of Fortune" designed to enrich the owners' association far above and beyond actual common expenses.

For all of the foregoing reasons, the Court finds that there is no genuine dispute of material fact and that SPH is not obligated to pay assessments to the Association for any of the 63 Unbuilt Units because those unconstructed units do not constitute "units" on which assessments may be imposed.[26]

---

[25]     The questions reasonably implicated in such an event would include the following: Should the entire assessment be struck down?  Should/may it be judicially modified to a per-unit figure that more accurately correlates to common expenses?  For what period of time?  Who decides?  What of the owners of the 7 Sold Units, the 16 Other Units, and the 2 Incomplete Units, all of whom have been diligently paying $400 monthly assessments?  Would they be entitled to rebates of the facially excessive charges?  How much?  Who decides?  Using what analytical framework or standard?

[26]     For the sake of clarity, the Court elaborates on this holding in three respects.  First, this ruling is dispositive of the Association's request under Alabama Code § 35-8A-316 for a "super priority lien against the 63 units acquired by Vision at the foreclosure sale for the six months preceding the date of the sale."  (Doc. 36, at 19.)  Such a lien would exist only for unpaid assessments that are due and owing to the Association.  The Court having concluded as a matter of law that no delinquent assessments have accrued as to the 63 Unbuilt Units, the Association is not entitled to any lien against SPH's property for failure to pay such assessments.  Second, this reasoning defeats the Association's damages claim relating to unpaid assessments for the 63 Unbuilt Units for the period of January 2011 through the present.  No assessments are due for the 63 Unbuilt Units, so the Association cannot recover damages from SPH/Vision for failure to pay same.  Third, the 2 Incomplete Units are interesting because the Association lumps those units into its request for damages, while at the same time admitting that because the owners of those two units are not parties, "the court would not have jurisdiction to enter an order on those units."  (Doc. 36, at 14 n.4.)  The Association does not explain (i) why no assessments were withheld at (Continued)

**B.      SPH's Other Claims for Declaratory and Injunctive Relief.**

In the wide-ranging claim for declaratory and injunctive relief presented in Count One of the Complaint, SPH not only seeks adjudication of its rights and obligations to pay assessments (as addressed *supra*), but also requests that the Court declare (i) that SPH is entitled to call a special meeting of the Association, (ii) that SPH is entitled to cast votes to remove directors and elect new directors at Association meetings, and (iii) that SPH is entitled to immediate and complete access to the Association's books and records.  (Doc. 1, at 7.)[27]  Both sides have moved for summary judgment on each of these claims.

With regard to whether SPH is entitled to call a special meeting, remove/elect directors, and so on, the Association's threshold argument is that this issue is moot because "SPH no longer owns any completed units."  (Doc. 33, at 22 n.2.)  It is true enough that SPH does not own any units that are part of the Association.  After all, SPH sold the 16 Other Units and the 2 Incomplete Units, and the Court has already held that the 63 Unbuilt Units are not "units" for Association purposes.  However, when SPH sold each of the 16 Other Units in the first months of 2012, it obtained an "Irrevocable Proxy" from the purchaser.  (Harmon Decl., ¶ 6.)  These 16 proxies state that the unit purchaser grants and assigns SPH "an irrevocable proxy and right to vote … as a member of the [Association] and as the owner of the Unit, on all matters coming

_____

the time of closing of those two units, as happened for the closing of the 16 Other Units; or (ii) how it could be entitled to damages from SPH for assessments that have gone unpaid by the owners of the 2 Incomplete Units.  At any rate, there is no evidence whatsoever in the record that the 2 Incomplete Units were at any time sufficiently advanced in their construction that they might be deemed "units" within the meaning of the Act, the Declaration and the Bylaws.  Therefore, the portion of the Association's damages claim seeking to hold SPH/Vision responsible for unpaid assessments for the 2 Incomplete Units is properly dismissed.

[27]      In Count One, SPH also requested judicial declarations that the assessments and liens imposed by the Association are invalid, and that the Association must provide SPH an accounting of the Association's financial transactions and matters.  (*Id.*)  The assessment issue has fully been addressed *supra* and need not be addressed separately here.  And SPH makes no mention of the accounting issue in its summary judgment briefs, such that by all appearances that claim has been abandoned.  At any rate, it does not appear that SPH has any legitimate right or redressable need for an accounting from the Association, given that it no longer owns any units at The Rookery III, does not belong to the Association, and does not owe assessment payments to the Association.

before the [Association] and/or to which members of the [Association] are entitled to vote … for a period of one (1) year commencing on the date hereof."  (Harmon Decl., at Exh. 6.)  Thus, at present, SPH holds proxies for 16 of the 23 units in the Association (or, if the 2 Incomplete Units are properly counted as units, for 18 of 25 units in the Association).  SPH contends that these proxies confer upon it the rights to call special meetings, vote on dismissal or election of directors, and so on.  According to SPH, the Association has impaired these rights by refusing to recognize SPH's attempts to exercise them.

The Association fires back that the proxies are invalid under the Bylaws, which specify that a proxy "shall be valid only for the particular meeting designated in the proxy" and "shall be revocable at any time at the pleasure of the person executing it."  (Doc. 27, Exh. C., at § 13.)  The proxies obtained by SPH do not designate a particular meeting and are irrevocable on their face;[28] therefore, the Association argues, they are invalid and unenforceable.  In response, SPH insists that the Bylaws must be cast aside on this point because they are "in conflict with the Articles of Incorporation, the Declaration and the Uniform Condominium Act."  (Doc. 44, at 1.)  SPH's premise is that, in the event of a conflict, the Act, Declaration, and Articles prevail over the Bylaws.  Generally speaking, that is a correct statement of law.  *See* Ala. Code § 35-8A-203(c) ("In the event of a conflict between the provisions of the declaration and the bylaws, the declaration prevails ….").  The trouble is that SPH has identified no conflict.  More precisely, SPH has identified no language in the Act, the Declaration, or the Articles that would (i) authorize proxies that fail to designate a particular meeting for which they will be effective, or (ii) authorize irrevocable proxies.  Instead, SPH simply points out that the Act, the Declaration and the Articles are silent as to these matters.  In SPH's view, the conflict is that "[n]one of them require that the proxy be revocable or that it be linked to a particular meeting."  (Doc. 44, at 1 n.1.)  But silence does not a conflict make.  Far from clashing with the Act, the Declaration, and the Articles, the Bylaws supplement those documents with additional rules and requirements

---

[28]        Any lingering doubt about whether the proxies may be revoked by the unit purchasers is eradicated by the following language:  "**THIS PROXY IS IRREVOCABLE, AND CANNOT BE REVOKED, CANCELLED OR TERMINATED, AND SHALL NOT EXPIRE UNTIL ONE (1) YEAR AFTER THE DATE HEREOF**."  (Harmon Decl., Exh. 6.)

concerning proxies.  SPH incorrectly conflates the concept of supplementation/elaboration with that of conflict/inconsistency.[29]

In light of the foregoing, the Court concludes that the "Irrevocable Proxies" on which SPH relies as its legal basis for seeking to call a special meeting and exercising voting rights are invalid under the Bylaws because they do not designate a particular meeting and are irrevocable. The Court further concludes that the applicable provisions of the Bylaws are enforceable and do not conflict with the Alabama Uniform Condominium Act or other governing documents for The Rookery III.  Because SPH's request for an injunction or declaration allowing it to call a special meeting and vote on the Association's directors hinges on the validity of the Irrevocable Proxies, and because those proxies are improper and invalid under the applicable Bylaws, the Court will enter summary judgment in the Association's favor on this cause of action.[30]

With respect to SPH's request for declaratory relief that it is entitled to "full access to all books and records of the Association" (doc. 1, at 7), this claim for relief is **moot**.  It is undisputed that SPH has been granted full access to the Association's books and records during discovery in this litigation.  Moreover, it does not appear that there is any current, live dispute between SPH and the Association as to whether SPH may examine the Association's books and records.  Accordingly, even if this claim were not moot, the Court would exercise its discretion

---

[29]     Examination reveals the absurd results that would logically follow from SPH's reasoning.  If SPH were correct, then any language in the Bylaws that was not also set forth in the Act, the Declaration, or the Articles would be a "conflict" and therefore invalid.  This would mean that the Bylaws would be totally ineffectual, and that drafting Bylaws would be a meaningless, redundant exercise of simply copying down exact provisions from the other documents, with no supplementation or elaboration whatsoever.  Nothing in Alabama law, the governing documents, or SPH's argument would support marginalizing the Bylaws in this manner by adopting an expansive interpretation of the term "conflict" to invalidate any text in the Bylaws that was not also recited in the Declaration.

[30]     As an aside, there is no discernible, valid reason why SPH would want to call Association meetings and vote on its directors at this time.  SPH owns no units, is not an owner or member of the Association, and is not subject to monthly assessments.  Under the circumstances, it is unclear why SPH would wish to exercise control over the Association's activities.  Of course, regardless of the purity or lack thereof of SPH's motives, or the legitimacy or lack thereof of its reasons for wanting to interfere with the Association and handpick its leadership, the fact remains that the proxies through which SPH would exert such control are invalid and unenforceable under the Bylaws, so this claim must fail.

under the Declaratory Judgment Act not to hear or decide this claim, as to which there appears to be no actual, *bona fide* disagreement between the parties today.[31]  This claim is properly dismissed on summary judgment.

### C. *SPH's Claim Against Cooper for Denial of Access.*

In Count Two of the Complaint, SPH brings a statutory claim against Cooper, personally, for denying SPH access to the Association's books and records.[32]  SPH alleges that "Cooper has denied SPH access to the Association's books and records without justification" and that she is therefore liable in damages under Alabama Code § 10A-1-3.32.  Subsection (d) of that statute allows an award of damages against "[a]ny agent or governing person of an entity who, without reasonable cause, refuses to allow any owner or member … to inspect any books or records of the entity."  *Id.*

Cooper's argument for why SPH cannot prevail on this claim is as simple as it is compelling.  Her position – and the uncontroverted evidence of record – is that the Association's books and records were never in her custody or control.  (M. Cooper Aff., ¶¶ 5, 10.)  As a result, Cooper was in no position to grant or deny SPH access to documents that she did not have and that she did not control.  SPH has come forward with no evidence that Cooper did possess

---

[31]     It is well-settled that the Declaratory Judgment Act is properly "understood to confer on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants."  *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286, 115 S.Ct. 2137, 132 L.Ed.2d 214 (1995).  Indeed, the Supreme Court has "repeatedly characterized the Declaratory Judgment Act as an enabling Act, which confers a discretion on the courts rather than an absolute right upon the litigant."  *Id.* at 287 (citations omitted).  As the Eleventh Circuit has observed, the Act "only gives the federal courts competence to make a declaration of rights; it does not impose a duty to do so."  *Ameritas Variable Life Ins. Co. v. Roach*, 411 F.3d 1328, 1330 (11th Cir. 2005).

[32]     Count Two is directed solely against defendant Cooper, not the Association.  Although SPH argues in its briefs that the <u>Association</u> denied it access to books and records, that claim was not presented in the pleadings and is not part of the case.  Of course, a plaintiff may not use its summary judgment brief as a *de facto* amendment of the complaint.  *See, e.g., GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1258 n.27 (11th Cir. 2012) ("It is well-settled in this circuit that a plaintiff may not amend the complaint through argument at the summary judgment phase of proceedings.");  *Godfrey v. Nationwide Vinyl Siding & Home Imp., LLC*, 2012 WL 6569292, *12 n.23 (S.D. Ala. Dec. 14, 2012) ("Plaintiffs cannot use their summary judgment brief as a *de facto* amendment to their pleadings.").  Having sued Cooper alone for wrongfully denying it access to books and records in November 2011, SPH cannot now seek to hold the Association liable for wrongfully denying such access in November 2011.

custody or control of such materials.  Nor has SPH cited any law or propounded any argument that Cooper may be held personally liable under § 10A-1-3.32(d) when she lacked custody or control over the records sought.  More generally, there is no evidence that Cooper decided – or had anything to do with the Association's decision – not to produce the Association's books and records to SPH in a reasonably prompt and timely fashion after SPH requested access to same via letter dated November 1, 2011 (just three days before SPH filed suit).  Accordingly, SPH's claim against Cooper for damages under § 10A-1-3.32(d) is properly dismissed for want of evidence from which a reasonable factfinder could determine that Cooper is liable for denying SPH access to requested books and records.

> **D.     SPH's Slander of Title Claim.**

Recall that in Count Three of its Complaint, SPH asserted claims under Alabama law for slander of title against the Association and Cooper.  This cause of action was predicated on the defendants' "filing of … assessments and liens against SPH's 16 completed 'Units' and other property within the Project," which activity SPH says had the effect of "clouding, disparaging and slandering the title to SPH's property in the Project," such that "SPH cannot sell any of such property while the assessments/liens exist in said public records."  (Doc. 1, ¶ 22.)  Although the briefing on this claim is cursory at best and the claim itself appears to have been little more than an afterthought, both sides have moved for summary judgment on it, so the Court will proceed to examine SPH's slander-of-title cause of action.

Under Alabama law, a cause of action for slander of title consists of the following elements:  "(1) Ownership of the property by plaintiff; (2) falsity of the words published; (3) malice of defendant in publishing the false statements; (4) publication to some person other than the owner; (5) the publication must be in disparagement of plaintiff's property or the title thereof; and (6) that special damages were the proximate result of such publication (setting them out in detail)."  *Folmar v. Empire Fire and Marine Ins. Co.*, 856 So.2d 807, 809 (Ala. 2003) (citations omitted); *see also Dabbs v. Four Tees, Inc.*, 36 So.3d 542, 558 (Ala.Civ.App. 2008) (same).  On this record, SPH cannot satisfy all of these elements with respect to Count Three.[33]

---

[33]     In so concluding, the Court declines to adopt the Association's reasoning that its November 23, 2011 release of liens renders this claim moot.  Although the Association released its liens on that date, it specifically denied in the Release papers that the "indebtedness relating to such liens has been satisfied," and insisted that "[s]uch indebtedness remains unpaid and due and (Continued)

For analytical purposes, the Court divides the slander of title claim into two component parts.  First, SPH maintains that the Association's liens slandered the title of the 16 Other Units (all of which SPH sold in the spring of 2012), forcing SPH "to lower the closing price for each Unit by the dollar amount of the liens claimed by the Association" and ostensibly damaging SPH to the tune of $58,800 (the total amount by which the closing prices of the 16 Other Units were lowered to account for unpaid assessments).  (Doc. 27, at 14.)  SPH argues that it "is entitled to recover that amount as damages" in Count Three.  (*Id.*)  This is not a viable slander of title claim because (i) the Association's statement that assessments were owed on the 16 Other Units was not false (the Court having concluded that the original $400 monthly assessment was valid and enforceable as to the completed units); (ii) there is no evidentiary support for a finding that the Association's statement that assessments were owed on the 16 Other Units was malicious;[34] and (iii) SPH has no proof of special damages because the assessments paid at closing for the 16 Other Units were, in fact, due and owing, such that SPH did not incur damage by virtue of their payment.

---

owing to the Association."  (M. Cooper Aff., Exh. A.)  If that statement (which was published in Baldwin County Probate Court records) was false and malicious, and caused special damage to SPH, then SPH could maintain a slander-of-title claim against the Association, notwithstanding the nominal release of the liens.

[34]     *See Folmar*, 856 So.2d at 809 ("The act against which a slander-of-title action is taken must have been false *and* malicious when it was performed.").  Malice is a critical element of the cause of action; indeed, Alabama law recognizes that "a rival claimant is conditionally privileged to disparage another's property in land by an assertion of an inconsistent legally protected interest in himself."  *Alabama Power Co. v. Laney*, 428 So.2d 21, 22-23 (Ala. 1983) (citation omitted).  To constitute the requisite malice to sustain a slander-of-title claim, a plaintiff must come forward with "proof that [the defendant] intentionally disparaged [the] plaintiff's title to the property slandered or *recklessly* disparaged [it] *without information sufficient to support a bona fide belief* in the veracity of the disparaging statement."  *Roden v. Wright*, 646 So.2d 605, 611 (Ala. 1994) (citations omitted).  "Malice does not equate with negligence."  *Id.*  No reasonable factfinder could conclude on this record that the Association lacked information sufficient to support a *bona fide* belief in the fall of 2011 that assessments were due and owing on the 16 Other Units, which had been completed and on which not a dime's worth of assessments had ever been paid by anyone, even as owners of the 7 Sold Units were paying $400 every month in assessments.

Second, SPH maintains that the Association's liens and statements concerning due and unpaid assessments support a slander-of-title claim on the "remaining bare land that currently has no Unit on it," inasmuch as "SPH has been unable to sell that property because of the existence of those public filings." (Doc. 27, at 14.) This aspect of SPH's slander-of-title claim flunks the special-damages element of proof. Under Alabama law, "[s]pecial damages may be demonstrated by proof that defendant's disparagement of plaintiff's title to the slandered realty interrupted, or injuriously affected, some dealing of the plaintiff with his property." *Harrison v. Mitchell*, 391 So.2d 1038, 1041-42 (Ala.Civ.App. 1980) (citation and internal quotation marks omitted). SPH has come forward with no evidence that it has been damaged by the Association's statement that assessments were due and owing on the unimproved land where the 63 Unbuilt Units were contemplated; therefore, this claim must fail.[35]

For all of the foregoing reasons, the Association and Cooper's Motions for Summary Judgment will be granted as to Count Three of the Complaint, and SPH's claim against them for slander of title will be dismissed.

### E. Claim Brought by Marion Cooper.

In addition to the claims that SPH brought against Cooper in its original Complaint (all of which have been addressed and resolved *supra*), Cooper leveled a claim of her own against SPH, pursuant to the "Alabama Litigation Accountability Act and Rule 11." (Doc. 5, at 18.) Her stated grounds for asserting such a cause of action are that SPH refused to dismiss its claims against her for denial of access and slander of title and that SPH "should be liable to Cooper for

---

[35] To be sure, SPH asserts in its brief that "SPH has been unable to sell that property because of the existence of those public filings." (Doc. 27, at 14.) There is, however, no evidence of record from which a reasonable factfinder could draw any nexus between the Association's statement that assessments are due on the property, on the one hand, and SPH's failure to sell the property, on the other. Counsel's *ipse dixit* that such a causal relationship exists cannot be credited on summary judgment, in the absence of citations to evidence that might reasonably support it. *See generally Odom v. Southeast Supply Header, LLC*, 675 F. Supp.2d 1105, 1110 n.3 (S.D. Ala. 2009) (observing that counsel may not include in factual recitations certain "facts" not supported by record citations); *Taylor v. Holiday Isle, LLC*, 561 F. Supp.2d 1269, 1275 n.11 (S.D. Ala. 2008) ("Unadorned representations of counsel in a summary judgment brief are not a substitute for appropriate record evidence."). On this record, there is simply no evidence linking the Association's claimed assessments with SPH's purported inability to sell the land; therefore, there is no proof of special damages, and no claim for slander of title is cognizable here.

monetary sanctions, reasonable expenses and attorney's fees" for having pursued such claims "without reasonable grounds, for improper purpose, and without factual support." (*Id.*)  Both SPH and Cooper seek summary judgment on this claim.

Insofar as it purports to be a claim brought under Rule 11 of the Federal Rules of Civil Procedure, Cooper's counterclaim is procedurally improper.  The appropriate vehicle for raising a Rule 11 issue is a motion, not a counterclaim.  *See, e.g., Hooker v. Dallas Independent School Dist.*, 2010 WL 4025877, *10 (N.D. Tex. Oct. 13, 2010) (denying leave to file counterclaim because "Rule 11 does not create a cause of action that may be presented by counterclaim"); *Wapato Heritigate, LLC v. Evans*, 2008 WL 4148871, *1 (E.D. Wash. Aug. 29, 2008) (dismissing defendant's Rule 11 counterclaim as "procedurally improper"); *Collins v. Allen*, 2005 WL 1073369, *2 (S.D. Ohio Mar. 16, 2005) (explaining "clear state of the law that a violation of Rule 11 does not constitute a separate cause of action"); *Lenoir v. Tannehill*, 660 F. Supp. 42, 44 (S.D. Miss. 1986) ("It appears clearly beyond question that Rule 11 by its express terms only permits an attorney procedurally to raise a claim for sanctions through a motion.").  Accordingly, SPH's Motion for Summary Judgment is granted insofar as it relates to the Rule 11 portion of Cooper's counterclaim.

Under the Alabama Litigation Accountability Act, Ala. Code §§ 12-19-270 *et al.* (the "ALAA"), a court shall award "reasonable attorneys' fees and costs against any attorney or party, or both, who has brought a civil action, or asserted a claim therein … that a court determines to be without substantial justification." Ala. Code § 12-19-272(a).  The phrase "without substantial justification" is defined in the ALAA to mean a claim that "is frivolous, groundless in fact or in law, or vexatious, or interposed for any improper purpose, including without limitation, to cause unnecessary delay or needless increase in the cost of litigation." Ala. Code § 12-19-271(1).  Cooper also seeks relief against SPH under the ALAA.

As discussed *supra*, the Court has already found that Cooper is entitled to summary judgment on the claims SPH asserted against her.  However, that determination is not dispositive of the analytically distinct question of whether Cooper may recover her attorney's fees under ALAA.  The phrase "without substantial justification" is not a fancy synonym for "unsuccessful;" rather, much more is required to prevail under the ALAA.  *See generally Morrow v. Gibson*, 827 So.2d 756, 763-64 (Ala. 2002) ("Morrow must have been more than 'simply legally incorrect' to justify an award of attorney fees pursuant to the ALAA.  The legal

insufficiency of his position must be susceptible to a conclusion that no reasonable and competent attorney would have advanced the contention that he did."). Cooper cannot satisfy this high bar.

Recall that SPH's claims against Cooper were that she had wrongfully denied SPH access to the Association's books and records (Count Two) and that she had slandered SPH's title to the property by filing the liens (Count Three). As to Count Two, SPH alleged in the Complaint that, "[o]n information and belief, Cooper is handling and/or is in possession of some or all of the books and records of the Association" and was holding herself out as an agent or governing person of the Association. (Doc. 1, ¶ 18.) As to Count Three, SPH alleged that Cooper's statements in liens she executed as agent of the Association slandered SPH's title to the property, giving rise to personal liability as a matter of Alabama statute.

Cooper argues that Count Three was brought against her "without substantial justification" because she "was acting in a representative capacity when she signed the liens." (Doc. 41, at 12; *see also* doc. 30, at 29.)[36] As a matter of well-settled Alabama law, however, torts committed by a person in her representative capacity in no way insulate her from personal liability. *See, e.g., Ex parte McInnis*, 820 So.2d 795, 798-99 (Ala. 2001) ("A corporate agent who personally participates, albeit in his or her capacity as such agent, in a tort is personally liable for the tort."); *Ex parte Charles Bell Pontiac-Buick-Cadillac-GMC, Inc.*, 496 So.2d 774, 775 (Ala. 1986) ("In Alabama, the general rule is that officers or employees of a corporation are liable for torts in which they have personally participated, irrespective of whether they were acting in a corporate capacity."); *Prince Hotel, S.A. v. Blake Marine Group*, 2012 WL 4711897, *5 (S.D. Ala. Oct. 2, 2012) ("If Zatezalo committed that tort, it makes no difference whether he did so in a representative capacity or not. Either way, he would remain liable for his own tortious conduct."). Nor is Cooper correct that "the alleged basis for SPH's slander of title claim was eliminated when the liens were released" (doc, 41, at 12). As previously discussed, by

---

[36]     Cooper's most strident formulation of this argument is that she "was acting in her capacity as agent for the Association, not in her individual capacity, when she signed the liens. As such, she never should have been sued by SPH …." (Doc. 43, at 2.) This is not an accurate statement of Alabama law. One who commits a tort in Alabama by slandering the title of someone else's property is not relieved of personal liability merely because she committed the tort on behalf of someone else. Abundant authority supports this proposition, and Cooper has identified none to the contrary.

releasing its liens, the Association did not erase the disparaging statements against SPH's interest in the property; rather, the Association continued to press its position (first expressed by Cooper in the liens themselves) that substantial unpaid assessments on that property remained due and owing to the Association.  Thus, SPH's slander-of-title claim against Cooper was not rendered "without substantial justification" for ALAA purposes simply because Cooper signed the allegedly false, malicious statements in a representative capacity, or because the liens were subsequently released.  No viable ALAA claim can be sustained against SPH for bringing a slander-of-title claim against Cooper.

　　　　With regard to access to books and records, Cooper weakly protests that she "never refused SPH's demand for access to the books and records."  (Doc. 30, at 29.)  Let us review the record facts:  On November 1, 2011, SPH's counsel sent a letter to the Association's counsel, with a copy to Cooper individually, demanding access to the Association's books and records and fixing a response deadline of November 3, 2011.  (J. Cooper Aff., at Exh. M.)  SPH explained in the November 1 letter that it was making this demand directly of Cooper because she had held herself out as an "agent" of the Association in executing the liens, and the applicable Alabama statute imposes personal liability on an entity's agent who refuses access to books and records.[37]  For aught the record shows, Cooper made no response prior to the November 3 deadline.  She did <u>not</u> promptly notify SPH that she lacked custody or control of the books and records.  She did <u>not</u> specify that she was not the Association's "agent" with respect to its books and records.  She did <u>not</u> notify SPH that she and/or the Association would make those books and records available for inspection in a reasonably prompt manner.  Instead, Cooper did nothing, which could reasonably have been perceived by SPH as a denial of access.  Under the circumstances, it cannot fairly be said that SPH's assertion of a statutory claim against Cooper

---

[37]　　　　The relevant statutory language reads as follows:  "Any agent or governing person of an entity who, without reasonable cause, refuses to allow any owner or member … to inspect any books or records of the entity shall be personally liable to the … member for a penalty in an amount not to exceed 10 percent of the fair market value of the ownership interest of the owner or member, in addition to any other damages or remedy."  Ala. Code § 10A-1-3.32(d).

for failure to provide access to the Association's books and records was "without substantial justification," so as to give rise to AALA liability on the part of SPH.[38]

The bottom line is that, while SPH's claims against Cooper were ultimately deemed not to have merit, they were not so lacking in factual or legal justification as to warrant the imposition of liability on SPH under the ALAA (or the imposition of sanctions against SPH under Rule 11). SPH's acts of asserting colorable claims against Cooper and refusing to withdraw them on opposing counsel's *ipse dixit* were not unreasonable, and do not warrant imposition of sanctions or shifting of fees on these legal theories. Summary judgment is properly entered in SPH's favor on Cooper's counterclaim.

> ### F.    The Association's Claims for the Water Bill and Enforcement of Liens.

Finally, the Court pauses briefly to address two throw-in claims asserted by the Association against SPH. As Count Three of its Counterclaims against SPH and its Third-Party Claims against Vision, the Association has sued them both for "open account" on the theory that "Vision's and/or SPH's agent or employee turned on the water at the Project without authority. As a result, Vision and/or SPH are indebted to the Association for the unpaid water bill." (Doc. 5, ¶ 15.) Briefing reveals that "[t]he Association is not moving for summary judgment on that claim." (Doc. 36, at 12 n.3.) However, SPH is. And SPH has submitted record evidence showing that "[a]t no time did an agent or employee of Vision or SPH turn water on at the

---

[38]    Cooper's alternative arguments on Count Two fare no better. In that regard, she suggests that SPH's decision to sue her was malicious and mean-spirited because SPH did not also sue the Association's bookkeeper, Paula Irwin. (Doc. 41, at 12.) But the record reveals a clear good-faith basis for SPH's decision to treat Irwin and Cooper differently, to-wit: Immediate contact from Irwin's lawyer explaining that she was in a "fix" because SPH was entitled to see the records but she was engaged by the Association, not SPH. (J. Cooper Aff., at Exh. N.) No such dilemma existed with respect to Cooper. Moreover, unlike Irwin, Cooper did not contact SPH to endeavor to work things out prior to the deadline. Likewise, Cooper's contention that the November 15 letter from the Association's lawyer to SPH's lawyer demanding that the claims against Cooper be withdrawn somehow favors her ALAA claim is without merit. The November 15 letter was short on specifics but long on rhetoric, as it proclaimed in conclusory terms that the Association felt that "it is clear that there are no grounds to support a claim against Mrs. Cooper personally." (M. Cooper, at Exh. B.) Such posturing did not provide meaningful information to SPH (such as, for example, facts that she lacked custody or control over the Association's books and records, that she was not authorized by the Association to furnish or withhold them from anyone, etc.) that might have prompted it to conclude that its claims against her were without substantial justification.

Rookery III."  (Harmon Decl., ¶ 8.)  The Association has made no attempt to rebut this showing.  Simply put, the record is devoid of evidence from which a reasonable factfinder could conclude that SPH/Vision caused the water to be turned on at The Rookery III, much less that SPH/Vision bears legal responsibility for that water bill.  Accordingly, summary judgment will be entered in SPH/Vision's favor on Count Three of the Counterclaims/Third-Party Claims interposed by the Association.

        The last loose end is Count Four of the Counterclaims/Third-Party Claims, in which the Association seeks enforcement of liens on SPH's property (described in the pleading as "the 81 units") for unpaid assessments pursuant to Alabama Code § 35-8A-316.  (Doc. 5, ¶ 27.)  The Association has previously withdrawn the liens on file with the Baldwin County Probate Court pertaining to such property.  While § 35-8A-316 provides a statutory mechanism under which a lien for unpaid assessments is automatically created, such a lien would exist only for unpaid assessments that are due and owing to the Association.  The Court having concluded as a matter of law that no assessments have accrued as to the 63 Unbuilt Units, the Association is not entitled to any lien against SPH's property for failure to pay such assessments.  Nor, by the Association's admission, would it be proper in this action for the Court to enter a lien against the 16 Other Units for unpaid assessments, because (i) those owners are not parties to this lawsuit, (ii) the record shows that all unpaid assessments due and owing for the 16 Other Units were paid at the closings of said units in early 2012, and (iii) any unpaid assessments arising post-closing would not be the legal responsibility of SPH/Vision because it does not own those units.  As to the 2 Incomplete Units, there is no evidence that these units were sufficiently advanced in their construction during the time they were owned by SPH/Vision that they might be classified as "units" subject to assessments.  Even if they were "units," those 2 Incomplete Units are no longer owned by SPH/Vision, and the current owners are not parties herein, such that (once again) it would be improper for the Court to enforce liens against those particular units/parcels in the context of this action.  For all of these reasons, summary judgment will be entered in SPH/Vision's favor as to Count Four of the Counterclaims/Third-Party Claims.

**V.    Conclusion.**

        For all of the foregoing reasons, it is **ordered** as follows:

    1.      SE Property Holdings, LLC's Motion for Summary Judgment (doc. 26); Marion Cooper's Motion for Summary Judgment (doc. 29); the Association's Motion for

Summary Judgment as to SE Property's Complaint (doc. 32) are all **granted in part**, and **denied in part,** and the Association's Motion for Summary Judgment as to its Counterclaims/Third Party Claims (doc. 35) is **denied**;

2.      The Court **finds and declares** that neither SPH nor Vision presently owes unpaid assessments to the Association for any units at The Rookery III, and thereby **grants** SPH relief on that portion of its claim for declaratory and injunctive relief asserted in Count One of the Complaint;

3.      The Court **finds and declares** that SPH's request for a declaration that it is entitled to access to the Association's books and records is **moot**, and thereby **grants** the Association relief under Rule 56 on that portion of SPH's claim for declaratory and injunctive relief asserted in Count One of the Complaint;

4.      All other claims, counterclaims and third-party claims asserted by any party herein are **dismissed with prejudice**; and

5.      This Order resolving all claims and causes of action joined herein, the Clerk of Court is directed to close this file for statistical and administrative purposes.

DONE and ORDERED this 3rd day of January, 2013.

                              s/ WILLIAM H. STEELE_____
                              CHIEF UNITED STATES DISTRICT JUDGE